

**FILED**
**DECEMBER 27, 2007**
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**07 C 7265**

| | |
|---|---|
| SPOOZ, INC. ) | |
| ) | |
| Plaintiff, ) | Case No.: |
| ) | |
| vs. ) | JURY TRIAL REQUESTED |
| ) | |
| JAMÉ GROVES, ) | |
| ) | |
| PENG HE, and ) | **JUDGE ANDERSEN** |
| ) | **MAGISTRATE JUDGE COX** |
| LOGICBOX, LLC ) | |
| ) | |
| Defendants. ) | |

## COMPLAINT

Plaintiff Spooz, Inc. ("Spooz"), by and through its attorneys, for its Complaint against Defendants Jamé Groves ("Groves"), Peng He ("He"), and Logicbox, LLC. ("Logicbox"), allege as follows:

### PARTIES

1. Spooz is a publically traded Nevada Corporation. Spooz's primary business relates to the electronic trading industry. Spooz designs software and other products that can be used by traders and financial market analysts and observers.

2. On information and belief, Defendants Groves and He are Illinois residents. Both Groves and He have been employed by Spooz in the State of Illinois. Furthermore, both Groves and He have committed tortious acts including Trade Secret Misappropriation, Unfair Competition, Intentional Interference with Business Relations, Breach of Contract, and Fraud in this District.

3.      On information and belief, Groves has formed a Delaware Limited Liability Corporation named Logicbox, and is representing that Logicbox and/or Groves owns patentable and trade secret information that belongs to Spooz.

## JURISDICTION AND VENUE

4.      This action arises under the Illinois Trade Secrets Act, the laws of the State of Illinois, and to the extent that patent rights are involved, the federal laws relating to the inventorship, assignment, and ownership of certain patent rights.

5.      This Court has personal jurisdiction over Defendants Groves and He because Groves and He have conducted business in this State and executed the Agreements subject to the laws of this State. Further, Groves and He continue to do business in this State, and on information and belief, continue to use Spooz's trade secrets in this state.

6.      This Court has personal jurisdiction over Defendant Logicbox because, on information and belief, Logicbox is the new employer of Groves and He and Logicbox is being portrayed as the owner of the disputed Trade Secrets and Patent Rights.

7.      This Court has subject matter jurisdiction pursuant to the laws of the United States governing diversity jurisdiction actions, and unfair competition actions pursuant to 15 U.S.C. § 1125 and 28 U.S.C. §§ 1331, 1332 and 1338. More than $75,000 is at issue and Spooz is an out-of-state corporation.

8.      This Court has supplemental subject matter jurisdiction pursuant to 28 U.S.C. § 1367 and the doctrine of pendent jurisdiction.

9.      Venue in this judicial district is proper under 28 U.S.C. §§ 1391(b)(1) and 1391(b)(2).

## SPOOZ'S INTELLECTUAL PROPERTY

10. Spooz owns all right, title and interest in a number of Trade Secrets and patent-pending intellectual property ("Patent Rights") relating to its proprietary trading software and other technology. Such Trade Secrets and Patent Rights relate to, but are not limited to, the Custom Pricing Module ("CPM") and SpoozToolz products that have been developed by Spooz over the last several years.

11. Spooz is also the owner of the common law trademark Spooz.

12. The CPM and SpoozToolz products are Spooz's core business. Spooz has spent thousands of hours developing the products, and the significant benefits the products offer to Spooz customers have been proven.

13. As a requirement of performing their duties at Spooz, Groves and He were both provided with access to Spooz's Trade Secrets and confidential information covered by Spooz's Patent Rights. Groves and He signed confidentiality agreements and were bound by employment and non-competition agreements that required that Groves and He not misappropriate Spooz's Trade Secrets or Patent Rights, and that all materials provided to them be kept confidential. Groves and He also were provided with employee manuals and signed acknowledgements of receiving the employee manuals.

14. Among other things, Groves and He, as a condition to their employment, acknowledged the receipt of the Spooz Employee Handbook, which stated that:

> All of the company's records and information relating to Spooz, Inc. or its clients/employees are confidential and employees must, therefore, treat all matters accordingly. No Spooz, Inc. or employee-related information, including without limitation, documents, notes, files, records, computer files or similar material (except within the ordinary course of performing duties on behalf of Spooz, Inc.) maybe removed from Spooz, Inc. premises. Additionally, the contents of Spooz, Inc.'s records or information otherwise obtained in regard to business may not be disclosed to anyone, except where required for a business purpose. Employees

must not disclose any confidential information, purposefully or inadvertently (*through casual conversation or communication), to any unauthorized person inside or outside the office. Employees who are unsure about the confidential nature of specific information must ask their supervisor for clarification.

15. Both Groves and He, in consideration of their employment with Spooz, executed Confidentiality / Non-Competition Agreements ("CNA"). The CNA both Groves and He executed stated in part:

> **Proprietary Information** We understand that during our Retention we may produce, obtain, make known or learn about certain information that has commercial value in the business in which the Company is engaged and that is treated by the Company as confidential. This information may have been created, discovered or developed by the Company or otherwise received by the Company from third parties subject to a duty to maintain the confidentiality of such information. All information that is designated as confidential information by Company, or is made known to us as confidential information is hereinafter called "Proprietary Information.

16. The CNA further stated:

> **Assignment and Protection of Proprietary Information** We understand that all Proprietary Information will be the sole property of the Company and its assigns (or, in some cases, its clients, suppliers, or customers), and the Company and its assigns (or, in some cases, its clients, suppliers or customers) will be the sole owner of all patents, copyrights, and other rights in connection therewith. We hereby assign to the Company any rights we may have or acquire in such Proprietary Information. At all times, during both our Retention and after its termination, we will keep in strictest confidence and trust all Proprietary Information, and will not use, reproduce or disclose any Proprietary Information without the written consent of the Company, except as may be necessary in the ordinary course of performing our duties as a Consultant to the Company.

17. The CNA further stated:

> **Assignment of Inventions** We hereby assign and transfer to the Company our entire right, title and interest in and to all inventions made or conceived or reduced to practice by us that are unique and specifically developed for the Company, either alone or jointly with others during the period of our Retention. We acknowledge that all original works of authorship that are made by our (solely or jointly with others) within the scope of our Retention and that are protectable by copyright are "works made for hire", as that term is defined in the United States Copyright Act as in effect as of this date. We will, at the Company's request, promptly execute a written assignment of title to the Company for any

4

such invention and will preserve any such invention as confidential information of the Company.

We also hereby assign and transfer to, or as directed by, the Company all our rights, title and interest in and to any and all inventions, full title to which is required to be in the United States by a contract between the Company and the United States or any of its agencies that are unique and specifically developed for the Company.

## BACKGROUND OF GROVES AND HE

18. Groves contacted Spooz on or about November 2006, indicating that he was interested in Spooz's technology.

19. An in-person meeting and product demonstration was scheduled at the Spooz office, and at this meeting Groves offered his consultation on certain projects at no cost.

20. During the meeting, Groves stated that he was the Managing Principal and Founder of Relativity Holdings, LLC, another company in the electronic trading industry that had developed a sophisticated trade matching engine.

21. Groves also stated that "his" California-based development team was responsible for the development of certain technology, including the Relativity and "Island" trade matching engines, and that he maintained control over these developers and that they were available to be engaged for development of Spooz software in the future.

22. It was later discovered that most of these statements by Groves were misleading, if not false.

23. At a subsequent meeting, Groves indicated that "his" company, Relativity Holdings, was being purchased for approximately $29 million, that Groves was a 30% owner of Relativity Holdings, and since the acquisition was nearly finished he was now seeking "something interesting to do."

24. Groves also indicated that although he had never been registered with the National Futures Association, he had a clean compliance track record and there was nothing in his past that would preclude expedient registration.

25. All of these statements were relied upon by Spooz when deciding to engage and eventually employ Groves and were later found to be either misleading or false.

26. On January 16, 2007, Groves was hired as a consultant to Spooz at a contract rate of $14,000 per month. It was Groves' responsibility to design, develop and deploy a trading system for a planned proprietary trading division of Spooz, and to direct the development of SpoozToolz, the company's flagship product. Groves was given the title Director of Financial Engineering.

27. At the time, such a rate of pay was higher than even the management at Spooz, but Spooz relied on Groves' assurances and aforementioned statements, in addition to Groves' assurance that he would assist Spooz in continuing development of its proprietary software.

28. On April 1, 2007, Groves was made a full-time employee of Spooz and was offered employee benefits.

29. At the request of Groves, Spooz hired an additional person, Dr. Peng He, in February of 2007. He was under the direct supervision of Groves.

30. He was initially paid as a contractor at $12,000 per month, and was later converted to a full-time employee with benefits at $12,000 per month.

31. Spooz shared proprietary information, including Trade Secrets and information relating to Patent Rights, with both Groves and He in order for Groves and He to be able to further develop Spooz's products.

32. Groves promised a delivery date of April 1, 2007 for a proprietary product called the Statistically Weighted Arbitrage Recognition Model, or "SWARM."

33. As the delivery date approached, Groves cited numerous issues as to why he would not be able to comply with the date.

34. Each of those issues was addressed by Spooz, at the additional expense of Spooz.

35. Among Groves' cited reasons for delay was what Groves identified as less-than-cutting edge computers at Spooz.

36. In response to Groves' requests, Spooz purchased an additional $17,000 worth of computers. At Groves' request, still further equipment was purchased at a total price of over $21,000.

37. Despite repeated promises throughout April, May, and June that SWARM was being developed and was nearly finalized, Groves never finalized SWARM for Spooz.

38. In approximately June of 2007, Groves indicated that he would need to "beta test" the SWARM product at a third-party facility.

39. Spooz continued to pay Groves his salary, and provided Groves with a trading account of $25,000 in order to facilitate beta testing of the SWARM product.

40. Rather than using the trading account Spooz provided, Groves indicated he was going to use the account of James Pearce, a third party, to perform beta testing.

41. Mr. Pearce later acknowledged that Groves represented to him that Spooz was his company and that Groves had the permission of his "partners" to engage in trading. Groves also asserted to Mr. Pearce that Groves owned the Spooz software, trading systems, Trade Secrets and Patent Rights.

42. Spooz management agreed to the testing through the Pierce account with the condition that the Spooz trading account, set up specifically for beta testing SWARM, also be used in trading. On information and belief, Groves never traded under the Spooz account, as Spooz requested.

43. After being pressed for results of the beta testing of SWARM, Groves provided a written statement of the results to Spooz but insisted that he could not produce actual statements due to "confidentiality." Groves also represented to Spooz that, while he could itemize every trade he executed, Pearce had, unbeknownst to Groves, entered irresponsible trades in the account and had "blown the account up" on three separate occasions. Pearce has since stated that Groves was the only individual to execute trades for Pearce's sub-account.

44. Groves indicated in his written statement that:

All trading occurred in the account of Jim Pearce. The beta test period began July 2, 2007 and continued through July 18, 2007. For the beta period, only two spreads in the energy complex were traded. The following unaudited results were generated from account statements:

Trading Days: 12
Number of Trades: 244
Average Trades per Day:  20.3

Number of Winners: 234
Number of Losers: 5
Number of Scratches*: 5

Winning Percentage: 95.9 %
Losing Percentage: 2.05 %
Scratch Percentage: 2.05%
Average Winning Trade: ** $30
Average Losing Trade: ** $16

*A scratch is a trade initiated and offset at the same price. Transaction fee apply.
** Based upon one contract; excluding commissions and fees

45.     Based on Groves' representations and prior approval, Spooz issued a press release disclosing the record. Spooz also used these results to inform potential clients and investors of Spooz's success.

46.     Groves' representations were falsified, as Spooz later discovered.

47.     In fact, Groves' trading resulted in a $9,111.08 debit, rather than a winning percentage as represented by Groves.

48.     At approximately this time, without permission from Spooz, Groves loaded SWARM and the CPM, Spooz's proprietary and trade-secret-protected software, onto Mr. Pearce's computer where it remains as of the date of this filing. James Pearce was encouraged to use the software at will.

49.     On information and belief, Groves spent significant time during working hours at Spooz engaged in recruiting personnel, raising capital, and networking for Logicbox, a company Spooz later learned was formed by Groves prior to his employment at Spooz.

50.     While he was employed with Spooz, Groves attempted to convince James Pearce to finance a trading partnership that would utilize Spooz's Trade Secrets and proprietary software, in which Groves and Pearce would split trading profits.

51.     At approximately this time, Groves also met with individuals at Garwood Securities, LLC ("Garwood") another company in the trading industry.

52.     Groves represented to Spooz that his meeting with Garwood was successful and that the individuals he met could "assure" additional financing for Spooz. This was also a mischaracterization.

53.     In his visits with Garwood , Groves represented to individuals at Garwood that he owned Spooz's Trade Secrets and Patent Rights.

9

54.     On or about July, 2007, an existing shareholder of Spooz, David Larson ("Larson"), visited the Spooz offices to perform due diligence on the company for his father-in-law, a high net-worth individual. At that time, Larson was introduced to Groves.

55.     After obtaining Larson's contact information, on information and belief, Groves contacted Larson to pursue Larson's funding for Logicbox.

56.     Groves represented to Spooz that he had met with Chitex, another company in the trading industry.

57.     Groves represented to Spooz that Chitex was ready, willing and able to invest a minimum of $100,000 in capital into a managed account where the profits from trading SWARM would be shared. This was also a mischaracterization.

58.     On August 17, 2007, Spooz received an investment from Joe Fusco, a contact that Groves provided for Spooz.

59.     On or about August 22, 2007, Fusco stopped payment on his check.

60.     On information and belief, the only reason Fusco stopped payment was due to statements Groves made to Fusco.

61.     On information and belief, Fusco subsequently made a direct investment in Logicbox, or one if its affiliates or subsidiaries.

62.     On or about September 25, 2007, certain Spooz employees including Groves met with Ron Klipstein and David Podber, potential employees of Spooz.

63.     On or about September 30, 2007 during a meeting in the office of Paul Strickland, Groves resigned from Spooz. During that meeting, at which another Spooz officer was present, Groves was asked by Strickland if he had installed SWARM on computers belonging to James Pearce. Groves responded, "No."

64. At some point after obtaining contact information for Klipstein and Podber, Groves contacted Klipstein and Podber in an attempt to get them to join Logicbox.

65. Groves and He have misappropriated the Spooz Trade Secrets and/or the Patent Rights of Spooz, and operating under the entity of Logicbox, continue to misappropriate the Spooz Trade Secrets and Patent Rights.

66. On information and belief, Groves and He retained copies of the Spooz Trade Secrets, despite agreements that were in place that required Groves and He to not keep copies of the Trade Secrets, proprietary software and its associated source code.

67. On information and belief, Groves continues to hold himself out as the owner of the Spooz Trade Secrets and Patent Rights.

## COUNT I: MISAPPROPRIATION OF SPOOZ'S TRADE SECRETS

68. Spooz incorporates the preceding paragraphs as if set forth herein.

69. As set forth above, Spooz is the owner of certain confidential information, software and its associated source code and Trade Secrets.

70. Spooz has expended significant time and resources protecting and maintaining such software, its associated source code, confidential information and Trade Secrets, including requiring employees to sign non-disclosure/non-competition agreements and limiting access to such information. Spooz also does not release its source code, confidential information and Trade Secrets to clients.

71. On information and belief, and without authorization from Spooz, Groves, He, and Logicbox have willfully misappropriated Spooz's confidential information and Trade Secrets by using such Trade Secrets, installing such on non-authorized computers, and/or by retaining copies of the Trade Secret software and processes.

11

## COUNT II: INTENTIONAL INTERFERENCE WITH BUSINESS RELATIONS

72. Spooz incorporates the preceding paragraphs as if set forth herein.

73. On information and belief, Groves had awareness of Spooz's business relationships with certain of its existing and potential associates, employees, investors and/or customers.

74. On information and belief, on more than one occasion, Groves has approached potential Spooz associates, employees, investors and/or customers and has attempted to either cause those customers to terminate their relationships with Spooz, and/or to believe that Groves is the owner of Spooz's Trade Secrets, and/or attempted to establish relationships with himself and Logicbox, LLC.

75. On information and belief, Groves is offering similar or identical services as those of Spooz's Trade Secrets.

76. Groves' actions have affected Spooz and have caused the termination of at least one potential investor in Spooz.

77. Groves' conduct was intentional, willful and/or with utter disregard for Spooz's rights.

## COUNT III: INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

78. Spooz incorporates the preceding paragraphs as if set forth herein.

79. On information and belief, Groves and/or Logicbox has approached a number of Spooz's prospective associates, employees, customers and/or investors – meaning those with whom Spooz would like to have business relationships.

80. On information and belief, Groves and/or Logicbox have used and are using Spooz's confidential and Trade Secret information, as well as material covered by Spooz's Patent Rights.

81. Groves' and Logicbox's conduct was intentional, willful and/or with utter disregard for Spooz's rights.

### COUNT IV: UNFAIR COMPETITION

82. Spooz incorporates the preceding paragraphs as if set forth herein.

83. Groves and/or Logicbox have identified that he/it is the owner of certain of Spooz's Trade Secrets.

84. Groves and/or Logicbox have falsely identified products and Trade Secrets that belong to Spooz as his/its own.

85. On information and belief, Groves and/or Logicbox have identified that the Trade Secrets and products were related to Spooz's products.

86. At the time of making these statements, Groves and/or Logicbox knew that these statements were false and misleading as to the origin of the products and Trade Secrets.

### COUNT V: FRAUD

87. Spooz incorporates the preceding paragraphs as if set forth herein.

88. As set forth above, Groves has made false and misleading statements related to his background, his ownership of certain companies, his abilities, his whereabouts, his activities and his ownership of Trade Secrets and Patent Rights.

89. At the time Groves made these statements, he knew that the statements were false and/or misleading, and he knew that Spooz and James Pearce would rely upon such statements.

90. Spooz relied upon Groves' statements to its detriment.

## COUNT VI: BREACH OF CONTRACT

91.     Spooz incorporates the preceding paragraphs as if set forth herein.

92.     During their tenures at Spooz, Groves and He executed confidentiality/non-compete agreements, as well as a confidentiality agreement, consulting agreement, employment agreement and an employee handbook acknowledgment.

93.     Through a number of the actions set forth above, Groves and He have both breached their contracts with Spooz.

## PRAYER FOR RELIEF

Plaintiff Spooz respectfully requests judgment against Groves, He and Logicbox and entry of a final order including the following:

A.      Findings of fact and conclusions of law establishing that Defendants Groves, He, and Logicbox misappropriated Spooz's Trade Secrets and Groves and He breached their contracts with Spooz;

B.      Findings of fact and conclusions of law establishing that Defendants Groves and Logicbox intentionally interfered with business relations of Spooz, intentionally interfered with prospective economic advantage, committed fraud, and are liable for unfair competition under the Lanham Act;

C.      A preliminary and permanent injunction prohibiting Defendants Groves, He, and Logicbox from further misappropriation of trade secrets and from any further contact with any of Spooz's clients, investors, or business associates;

D.      A preliminary and permanent injunction requiring Defendants Groves, He, and Logicbox destroy all materials that are deemed to be Spooz Trade Secrets;

E.      Monetary compensation sufficient to compensate Spooz for its damages;

F. Punitive damages;

G. Costs and attorney fees;

H. Such further relief as the Court may deem just and appropriate.

**JURY DEMAND**

Pursuant to the Seventh Amendment to the Constitution of the United States and Fed.R.Civ.P. 38, Spooz requests trial by jury.

Date:   December 26, 2007                                     Respectfully submitted,


/s/ Christopher E. Haigh

Christopher E. Haigh
Indiana Bar No. 22038-49
IPAdvisors, Inc.
2038 N. Clark #105
Chicago, IL 60614
(312) 242-1685
(312) 277-9002 (facsimile)

/s/ Geoffrey A. Baker

Geoffrey A. Baker
Illinois Bar No. 6236658
DOWELL BAKER, P.C.
229 Randolph Street
Oak Park, IL 60302
(708) 660-1413
(312) 873-4466 (facsimile)

**Attorneys for Plaintiff
Spooz, Inc.**